In re the **MARRIAGE OF Robert James BOX and Virginia Lehe Box.**

**Robert James BOX, Appellant,**

v.

**Virginia Lehe BOX, Respondent.**

No. 21796.

Missouri Court of Appeals,
Southern District,
Division One.

April 7, 1998.

Motion for Rehearing and/or transfer to Supreme Court Denied April 28, 1998.

Application for Transfer Denied
June 16, 1998.

Daniel A. Parmele, Reynolds, Parmele & Gold, P.C., Springfield, for Appellant.

Scott B. Stinson, Mountain Grove, for Respondent.

CROW, Judge.

This is an appeal from a judgment dissolving the marriage of Robert James Box and Virginia Lehe Box. The issues this court must resolve concern a checking account into which Robert[1]—throughout the marriage—deposited his monthly Social Security check, his monthly pension check, and income from rental property he owned prior to the marriage.

The trial court awarded Virginia "$29,565.00 out of said account." Robert presents three claims of error attacking that award.

The parties married October 22, 1988. Robert was a widower, Virginia a divorcee. Their marriage was the third for each. At time of trial (January 14, 1997), Robert was 73, Virginia 70.

Robert had worked for John Deere Company from 1948 until 1977, when he retired. The pension mentioned in the first paragraph of this opinion vested upon his retirement.

At the time he married Virginia, Robert owned a duplex, debt-free. He and she resided in one unit throughout the marriage, until the separation. Robert rented the other unit to a tenant.

At the time of the marriage, Robert had a checking account—the one mentioned in the first paragraph of this opinion. A bank statement showed that on October 20, 1988 (two days before the marriage), the balance was $57,567.60.

Before the marriage, the parties signed an antenuptial agreement providing, *inter alia:*

" ... each party shall retain the real estate and personal property they now own in their own names with full power to convey or bequeath said property to their respective children or others without the other party having any rights thereto, and it is agreed that neither party shall upon or subsequent to said marriage acquire any interest, right, or claim in or to said real property or personal property described in the Schedules attached to this agreement."

The schedule of Robert's property attached to the agreement included, among other assets, the duplex and the checking account.

Robert never added Virginia's name to his checking account. Virginia maintained her own checking account during the marriage; Robert's name was never on it. Virginia deposited her Social Security checks into her account.

The parties separated September 11, 1996. A bank statement showed that on September 3, 1996 (eight days before the separation), the balance in Robert's checking account was $146,261.08—an increase of $88,693.48 during the marriage.

The trial court, in a perspicuous understatement, declared the parties led "a very frugal lifestyle during the course of the marriage," enabling Robert's checking account to grow by $88,694.28 between the date of the wedding and the date of separation.[2] The trial court ruled that the increase, in its entirety, was marital property. As reported in the second paragraph of this opinion, the trial court awarded Virginia $29,565 (one-third of the increase).[3]

The trial court held that $57,567.60 in Robert's account at the time of the separation

---

1. For brevity and clarity, this opinion refers to the parties by their respective forenames. No disrespect is intended.

2. An alert reader will observe there is an eighty cent difference between the trial court's calculation of the increase and this court's calculation of the increase.

3. Additionally, the judgment ordered Robert to pay Virginia maintenance of $400 per month and attorney fees of $750. Robert assigns no error regarding those awards.

was Robert's separate property. That sum, as we have seen, was the amount in the account two days before the parties married. The trial court awarded Robert all of the account except the $29,565 awarded Virginia.

The first of Robert's three points relied on avers the trial court erred in treating Robert's checking account as marital property[4] in that (a) it was one of the assets covered by the antenuptial agreement, and (b) the conduct of the parties during the marriage demonstrated they intended the account to be Robert's separate property, not marital property.

As reported in the first paragraph of this opinion, Robert deposited his monthly Social Security benefit, his monthly pension benefit, and the rental income from his duplex into his account. Those three sources, however, did not supply all of the money in the account.

Robert's account earned interest throughout the marriage. As this court comprehends the bank statements, the account earned $255.56 interest in October 1988, the month the parties married; the account earned $237.67 interest in the month preceding the separation.[5]

Another, albeit negligible, source of funds for Robert's account was the gain he realized from buying, restoring, and selling five automobiles during the marriage. Robert testified, without contradiction, that he did not make a profit on every vehicle, and never made more than $1,000 on any.

Neither party was employed during the marriage, hence no wages went into either party's checking account.

Virginia testified that a year after she married Robert, her Social Security benefit increased to $350 per month. She avowed she spent all of it each month on food, automobile expenses, clothing, personal needs and household items.

Robert, from his account, paid the property taxes, insurance, utilities, trash disposal, and maintenance on the duplex. His health care insurance through John Deere covered the parties' medical expenses. Additionally, Robert testified he bought some of the groceries.

The version of § 452.330 in effect when the trial court entered judgment in the instant case was the version in RSMo 1994. It read, in pertinent part:

"2 .... 'marital property' means all property acquired by either spouse subsequent to the marriage except:

. . .

(4) Property excluded by valid written agreement of the parties; . . .

. . .

3. All property acquired by either spouse subsequent to the marriage and prior to a decree of . . . dissolution of marriage is presumed to be marital property regardless of whether title is held individually or by the spouses in some form of co-ownership such as joint tenancy, tenancy in common, tenancy by the entirety, and community property. . . ."

■■■ It is well settled that where, during a marriage, a spouse receives interest earned by his or her non-marital property, the interest is marital property. *Coleberd v. Coleberd*, 933 S.W.2d 863, 869–70 (Mo.App. S.D. 1996); *Williams v. Williams*, 716 S.W.2d 13, 15 (Mo.App. W.D.1986); *Bizzell v. Bizzell*, 697 S.W.2d 559, 562–63[4] (Mo.App. E.D. 1985). Consequently, the interest earned by Robert's account after the wedding was marital property. Furthermore, to the extent that this postnuptial interest itself earned interest by remaining in Robert's account, the interest earned by the postnuptial interest was interest earned by marital property.

■■■ Where a spouse receives rental income from non-marital property during a marriage, the income is marital property.

---

4. Robert's averment that the trial court treated his account as marital property is misleading. As explained above, the trial court treated $57,567.60 in the account as Robert's separate property. The trial court treated the remainder—the amount by which the account increased between

the wedding and the separation—as marital property.

5. Apparently, the rate of interest earned by the account dropped between the marriage and the separation.

*Coleberd,* 933 S.W.2d at 868[2]. *Cf. In re Marriage of Schatz,* 768 S.W.2d 607, 611 (Mo.App. S.D.1989). Consequently, Robert's rental income from his duplex during the marriage was marital property.

■ Additionally, the modest income Robert generated by buying, restoring, and selling five automobiles during the marriage was unquestionably marital property. § 452.330.2, *supra.*

All of the marital income identified in the three preceding paragraphs went into Robert's checking account, hence Virginia had a plausible claim that the $88,693.48 increase in the account during the marriage included marital property.

■ Endeavoring to defeat Virginia's claim, Robert's first point asserts the claim is barred by the antenuptial agreement or, alternatively, that the parties' conduct demonstrated they intended Robert's account to remain his separate property.

Among the cases cited by Robert in support of his first point, only one, *Fuqua v. Fuqua,* 765 S.W.2d 640 (Mo.App. W.D.1989), has facts resembling those in the instant case. In *Fuqua,* a husband and wife sold marital property, then divided the proceeds. *Id.* at 644. The wife put her share of the proceeds into an account in her sole name; the husband put his share of the proceeds into an account in his sole name. *Id.* Both parties testified they considered their respective accounts as their separate property. *Id.*

The trial court in *Fuqua* held each party's account was the separate property of that party. *Id.* Affirming that ruling, the appellate court held marital property can be transmuted into separate property if there is clear and convincing evidence that *both* parties intended that such property be excluded from their marital property. *Id.* at [6]. The appellate court further held the parties' testimony constituted clear and convincing evidence that each party intended that each party's account be that party's separate property. *Id.*

Obviously, *Fuqua* is like the instant case in that each spouse maintained an account to which the other had no access. However, as explained in the next paragraph, there are significant differences between *Fuqua* and the instant case.

Virginia, reminded at trial about the antenuptial agreement, testified she asserted no claim to the amount Robert had in his checking account at the time she wed him. However, unlike the wife in *Fuqua,* who testified she intended all of the funds in the husband's account to be his separate property, Virginia never testified she intended the *increase* in Robert's account after she became his wife to be his separate property. Furthermore, to the extent that the increase in Robert's account constituted marital property, Virginia, unlike the wife in *Fuqua,* had no opportunity to participate with Robert in a transaction whereby the increase was transmuted from marital property into Robert's separate property. For those two reasons, this court holds *Fuqua* does not govern the instant case.

■ The trial court, in awarding Virginia $29,565 from Robert's checking account, implicitly held the antenuptial agreement did not bar Virginia from claiming that the increase in the account during the marriage was marital property. This court agrees with that ruling.

The antenuptial agreement (quoted in pertinent part earlier in this opinion) provided only that each party would retain the personal property "they now own in their own names." At the time of the wedding, Robert had $57,567.60 in his account. As Virginia astutely points out, nothing in the agreement indicates she intended to waive any claim she might have to assets acquired by Robert after the wedding, including those held in his account.

This court holds that neither the antenuptial agreement nor the parties' conduct during the marriage foreclosed Virginia from claiming that the increase in Robert's checking account during the marriage constituted marital property. Robert's first point is denied.

■ This court temporarily bypasses Robert's second point and addresses his third. It maintains the trial court erred in awarding Virginia one-third of the amount by which Robert's checking account increased during

the marriage in that "a significant portion of the contributions to this account were derived from [Robert's] monthly Social Security retirement income which is non-marital property." Consequently, argues Robert, the trial court wrongly awarded Virginia, as marital property, some of Robert's separate, non-marital property.

Robert bases his third point on § 169.572, RSMo 1994. It reads:

"1. No court shall divide or set aside any federal old-age, survivors or disability insurance benefit provided to any party pursuant to the federal Social Security Act, 42 USC Section 200 et seq., in any proceeding for dissolution of marriage.

2. Subsequent to August 28, 1991, a court of competent jurisdiction may divide the pension, annuity, benefits, rights, and retirement allowance provided pursuant to this chapter[6] between the parties to any action for dissolution of marriage, to the same extent and in the same manner the court may divide any federal old-age, survivors or disability insurance benefit of the parties provided pursuant to the federal Social Security Act."

In *Hogan v. Hogan*, 796 S.W.2d 400, 407[8] (Mo.App. E.D.1990), the court said: "Social Security benefits are unassignable as marital or separate property."

In *David v. David*, 954 S.W.2d 611 (Mo. App. W.D.1997), one of the issues concerned the wife's account in The Public School Retirement System of Missouri. *Id.* at 615–16. The court said:

"Section 169.572 . . . requires that Missouri teacher retirement accounts, which are in lieu of social security, be treated in the same manner as social security benefits. Social Security benefits are unassignable, and cannot be awarded as part of the division of property."

*Id.* at 616[8] and [9]. In support of that holding, *David* cited *Hogan*.

Three other cases, all dealing with teachers' accounts in The Public School Retirement System of Missouri, hold such accounts are not marital property and are thus not subject to division by a court in an action for dissolution of marriage. *Mallams v. Mallams*, 861 S.W.2d 822, 823–24[2] (Mo.App. W.D.1993); *Kieninger v. Catlett*, 854 S.W.2d 59, 60 (Mo.App. W.D.1993); *Gismegian v. Gismegian*, 849 S.W.2d 201, 204[8] (Mo.App. E.D.1993).

Although *David, Mallams, Kieninger* and *Gismegian* dealt with teachers' retirement accounts, not Social Security, those cases, read in conjunction with § 169.572 and *Hogan,* confirm that Social Security benefits and teachers' retirement accounts are treated identically in dissolution actions insofar as neither can be considered marital property.

It thus appears that had the sole source of funds in Robert's checking account been his Social Security benefits, the entire account—had it earned no interest—would have remained Robert's separate property[7] throughout the marriage, as the funds would have kept their Social Security identity.

That notion is buttressed by *Collins, Webster and Rouse v. Coleman,* 776 S.W.2d 930 (Mo.App. S.D.1989). There, a judgment creditor garnished a judgment debtor's bank account. *Id.* at 930–31. All funds in the debtor's account were direct deposits of Social Security disability benefits of the debtor and his disabled son. *Id.* at 931. The debtor moved to quash the garnishment; the trial court denied the motion. *Id.* On appeal, this court, applying a federal statute and a decision of the Supreme Court of the United States, held the debtor's bank account immune from garnishment. *Id.* at 931–32.

A like result was reached in *Hatfield v. Cristopher,* 841 S.W.2d 761 (Mo.App. W.D. 1992), which held a judgment debtor's bank account immune from garnishment where So-

---

**6.** Chapter 169, RSMo 1994, establishes The Public School Retirement System of Missouri. *See:* § 169.020.1, RSMo Cum.Supp.1996.

**7.** This court's examination of the record reveals that two names appear on the bank statements for Robert's account. One name, of course, is

Robert's. The other name is Michael Box. The transcript indicates Robert has a married son. Whether Michael Box is that son is consigned to speculation. Neither party addresses the effect, if any, of the presence of Michael's name on Robert's account.

cial Security benefits were commingled with other funds. *Id.* at 767[24].

However, unlike *Collins* and *Hatfield,* the instant case involves the identification and division of marital property between spouses, not an attempt by a creditor to seize a debtor's Social Security benefits.

Robert testified his Social Security benefit was $711 per month; his pension benefit was $700 per month; his rental income was $200 per month. Additionally, it will be recalled that the bank statements showed that during the marriage, Robert's account earned interest ranging between $237.67 and $255.56 per month.

The trial court could have reasonably found from the above evidence that disbursements from Robert's checking account consisted of commingled funds from those four sources (plus whatever funds were generated by Robert's sale of the five restored automobiles). There was no evidence that Robert intended to exclude his Social Security income from any disbursement. Thus, the trial court could have reasonably found that the sources of the funds disbursed from Robert's account were the same sources as those deposited into the account and that the ratio of the former matched the ratio of the latter. The trial court could also have reasonably found that while the increase in the account during the marriage included some of Robert's Social Security benefits, the increase did not consist exclusively of Robert's Social Security benefits. That is illustrated in the next two paragraphs.

Robert testified that when he married Virginia, he was receiving Social Security benefits of "around five hundred and something" per month. There was no evidence regarding the number of increases he received during the marriage, the amount of any increase, or when any increase occurred. The evidence showed only that at time of trial, Robert was receiving a Social Security payment of $711 each month.

Assuming, for the purpose of illustration, that Robert received a $711 Social Security payment each month during the marriage, he would have received only some $68,000 between the date of the wedding and the date of separation. Assuming further that he excluded every penny of that sum from every disbursement during the marriage, the $88,693.48 increase in his checking account during the marriage would have had to include some $20,000 of non-Social Security funds.

■ Having demonstrated that, this court leaves Robert's third point for the time being and addresses his second. It avers the trial court erred in awarding Virginia one-third of the amount by which Robert's checking account increased during the marriage in that "a significant portion of the contributions to this account" were from Robert's pension plan. The second point correctly asserts that Robert's pension rights vested long before he married Virginia. Consequently, says the second point, the pension was Robert's non-marital property, hence the $29,565 awarded Virginia, as marital property, from Robert's checking account included some of Robert's non-marital pension.

Virginia concedes that Robert's right to receive income from his pension plan was earned during his employment with John Deere and such right was fully vested when he retired in 1977, eleven years before the parties married. Accordingly, Virginia admits that Robert's pension plan itself is "a separate, non-marital pension."

Nonetheless, insists Virginia, each *payment* of pension income received by Robert during the marriage should be considered marital property because of § 452.330.3 (quoted earlier), which provides that all property acquired by either spouse subsequent to the marriage and prior to a decree of dissolution is presumed to be marital property. Virginia reminds us that where, during a marriage, a spouse receives income from his or her non-marital property, the income is marital property. *In re Marriage of Gardner,* 890 S.W.2d 303, 305–06[7] (Mo. App. S.D.1994); *Coleberd,* 933 S.W.2d at 868[3]. Although Virginia confesses she can find no case supporting her hypothesis that the pension income Robert received each month during the marriage constituted marital property, she reasons that the general rule in *Gardner* and *Coleberd,* set forth in the preceding sentence, supports that proposition.

There is logic in Virginia's theory. As noted earlier in this opinion, when a spouse receives interest earned by his or her non-marital property during the marriage, the interest is marital property. The same is true of rental income received by a spouse during the marriage from his or her non-marital property. Furthermore, where a spouse receives dividends from non-marital corporate stock during a marriage, the dividends are marital property even though the stock itself remains non-marital. *Colebeerd*, 933 S.W.2d at 869–70; *Bizzell*, 697 S.W.2d at 562–63[4].

Consequently, where (as here) a spouse, during a marriage, receives periodic income from a pension plan that was fully vested before the marriage, there are persuasive reasons to hold that the income, when received, is marital property even though the source of the income—the pension plan—remains a non-marital asset and, as such, is immune from division upon dissolution of the marriage.

Robert testified that when he married Virginia, his pension income, like his Social Security, was "around five hundred and something" per month. He confirmed that he will receive income from the pension the rest of his life. There was no evidence regarding the structure of Robert's pension plan and no indication that any payment he receives includes an invasion of principal,[8] thereby diminishing the resources from which future payments will come. To the contrary, Robert's monthly pension payment increased during the eight-year marriage from some $500 per month to $700 per month.

Recognizing that Robert's pension plan is non-marital property and will always remain so,[9] this court holds the monthly income Robert received from his pension plan during the marriage was "property acquired by [Robert] subsequent to the marriage" within the meaning of § 452.330.3, quoted *supra*, and was consequently presumed to be marital property. This court further holds that nothing in the record rebuts that presumption. Accordingly, this court holds that the increase in Robert's checking account during the marriage attributable to the pension income he received during the marriage and saved is marital property.

It will be recalled that the sources of funds in Robert's checking account at time of trial were: (a) $711 per month Social Security; (b) $700 per month pension; (c) $200 per month rental income; (d) interest ranging between $237.67 and $255.56 per month.[10] The average of the two latter amounts is $246.62.

Amounts "(a)," "(b)," and "(c)," combined with average monthly interest of $246.62, constitute an average monthly addition to Robert's checking account of $1,857.62. The $711 per month Social Security constitutes 38 percent of the monthly addition. That means the other 62 percent of the monthly addition consists of funds which this court has held to be marital property.

Earlier in this opinion, this court held the trial court could have reasonably found that the sources of the funds disbursed from Robert's account during the marriage were the same sources as those deposited into the account during the marriage, and that the ratio of the former matched the ratio of the latter. Accordingly, the evidence supports a finding that 62 percent of the $88,693.48 increase in Robert's checking account during the marriage is attributable to Robert's pension income, his rental income, and interest earned by the account. Sixty-two percent of $88,693.48 is $54,989.96. This opinion henceforth refers to the latter amount as "the marital increase."

Assuming—without deciding—that the amount of the increase in Robert's checking account attributable to the Social Security

---

**8.** An invasion of principal would, in effect, return to Robert money he paid into the plan before the marriage. Any such money would appear to be non-marital property.

**9.** The trial court correctly found that Robert's "pension benefits" are his separate, non-martial property.

**10.** The bank statement dated September 3, 1996, showed the interest earned during 1996 up to that date was $2,016.16, an average of $252.02 per month.

payments he received during the marriage remained his separate property (a troublesome notion that can be strenuously debated), it is manifest that the evidence supports a finding that the $54,989.96 marital increase includes no amount attributable to Social Security.

It is noteworthy that at time of trial, the marital increase may have been even greater than $54,989.96 (the amount at the time of separation). Robert testified that prior to the separation, he was saving around $1,200 per month, and that after the separation he continued to save "[p]robably the same" amount.

The $29,565 awarded Virginia by the trial court from Robert's account is 54 percent of the $54,989.96 marital increase. The trial court found Virginia's services as a homemaker contributed to the marriage. § 452.330.1(2), RSMo 1994. There was no evidence of misconduct by her. § 452.330.1(4).

A trial court is vested with considerable discretion in dividing marital property; an appellate court will interfere only if the division is so heavily and unduly weighted in favor of one party as to amount to an abuse of discretion. *Dardick v. Dardick*, 670 S.W.2d 865, 869[5] (Mo. banc 1984). Judicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the trial court's action, it cannot be said that the court abused its discretion. *State ex rel. Webster v. Lehndorff Geneva, Inc.*, 744 S.W.2d 801, 804[1] (Mo. banc 1988).

Measured by that standard, and mindful that the trial court found the parties' "very frugal lifestyle during the course of the marriage ... and related sacrifices" allowed Robert to accumulate an increase of over $88,000 in his checking account, this court holds the award to Virginia of $29,565 out of the $54,989.96 marital increase was not an abuse of discretion.[11]

Having decided that, this court need not return to Robert's third point, which complains that the $29,565 awarded Virginia included some of his Social Security income. This court has found the evidence sufficient to support the award to Virginia even if the amount of the increase in Robert's checking account during the marriage attributable to Social Security is excluded.

Judgment affirmed.

GARRISON, P.J., and PREWITT, J., concur.

11. Virginia lamented at trial: "I think I was used as a live-in maid."